IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLAIRON METALS
CORPORATION,

                                    Plaintiff,

        v.                                              1:05-cv-0809-WSD

CRH NORTH AMERICA, INC.,

                                    Defendant.

## OPINION AND ORDER

This is a commercial dispute between a material parts supplier and its

customer.  It is before the Court on Plaintiff Clairon Metals Corporation's Motion

for Partial Summary Judgment [33], Defendant CRH North America, Inc.'s Motion

for Partial Summary Judgment [34] and Plaintiff's Motion to Amend the

Complaint [47].

## I.      BACKGROUND

The facts of this case are largely undisputed.  Plaintiff Clairon Metals

Corporation ("Plaintiff") is a supplier of stamped metal products.  On December

18, 2001, Plaintiff and Defendant CRH North America, Inc. ("Defendant"), entered

into a "Nomination Letter" (the "Agreement") in which Plaintiff agreed to develop,

manufacture and sell to Defendant automotive parts for three projects.[1]  (Pl.'s

Statement of Material Facts ("PSMF") ¶ 1; Agreement, attached as Ex. E to Def.'s

Mot. for Partial Summ. J.)  These projects included the "Ford Project," the BMW

"SCS Program," and the Daimler Chrysler "E 85" project.  (Agreement at 1.)

    The Agreement states:  "Such development and manufacturing [of parts]

shall be made according to the below mentioned terms and conditions pending

issuance of an appropriate order by our company."  (PSMF ¶ 3.)  The Agreement

provides the parties' relationship also is based on the "General Conditions of

Purchase."  (Id.)[2]  The Agreement sets forth various obligations for Plaintiff, such

as providing a full-time program manager, a dedicated quality person and a

production planner.  (Agreement, ¶ 5.)  The Agreement also states:

---

    [1]  Plaintiff claims the Agreement may not be binding because it states only
that Defendant "intends to nominate [Plaintiff] to develop and manufacture the
following products . . . ."  (Pl.'s Mot. for Partial Summ. J. at 17.)  The Court is not
persuaded by Plaintiff's argument.  Plaintiff's Sales Manager, Barry Cooper,
testified Plaintiff was nominated and that the Agreement was an agreement to
supply parts to the Defendant.  (Cooper Dep. at 47-48.)  The Agreement also
states:  "We ask you to confirm your agreement with the above Nomination Letter
by signing the two original copies and returning one to CRH, by December."
(Agreement, ¶ 10.)  The Agreement was signed by both parties on December 18,
2001.  (Id.)

    [2]  The General Conditions of Purchase were not signed by either party.
(General Conditions of Purchase, Ex. 22 to Weier Dep.)

> 2.      Prices for mass production products
>
> . . .
>
> 2.2     Productivity
>
> > The life time agreement (LTA) includes a
> > yearly reduction of 1% for 5 years.  (0%, 1st
> > year/ -1%, 2nd year/ -1%, 3rd/ -1%, 4th
> > year/ -1%, 5th year/ -1%, 6th year)

(Agreement, ¶ 2.2.)

After the Agreement was signed by the parties, Plaintiff designed and built tooling used to manufacture parts for Defendant.  (PSMF ¶ 7.)  Defendant provided Plaintiff with scheduling releases forecasting Defendant's requirements for parts. (PSMF ¶ 9; Def.'s Resp. to PSMF ¶ 9.)  Upon receipt of the releases, Plaintiff purchased raw materials and manufactured, sold and delivered parts to Defendant according to the terms of the releases.  (Id.)

The relationship between the parties deteriorated rapidly.  Defendant claims that Plaintiff failed to produce parts that conformed to Defendant's specifications and Plaintiff claims Defendant conducted itself in an unprofessional manner. (PSMF ¶ 10; Def.'s Resp. to PSMF ¶ 10.)  On September 16, 2004,[3] Plaintiff

---

[3] Defendant claims that Plaintiff's President, Mr. Link, notified Defendant of the termination of the Agreement on September 13, 2004.  (Def.'s Statement of Undisputed Facts ("DSUF") ¶ 7.)  This difference is not material.

notified Defendant it no longer wished to continue the parties' business relationship.  (PSMF ¶ 10.)  After Plaintiff notified Defendant of its intention to terminate the relationship, Defendant located replacement suppliers to provide the products that Plaintiff had supplied to Defendant.  The parties cooperated during Defendant's transition to new suppliers.  (DSUF ¶ 9.)  The parties agreed to a production schedule which would allow Defendant to stock sufficient inventory to transition to replacement manufacturers without an interruption in supply.  (PSMF ¶¶ 10-11.)

 Plaintiff claims that at the time the parties decided upon the transition plan, Defendant did not intend to pay for the additional parts, and that the past due amount for these parts is $701,726.20, exclusive of interest.  (PSMF ¶ 12.) Defendant claims it did not know whether it would sustain damages from the transition to the new manufacturers until it discovered the cost of working with replacement suppliers.  (Def.'s Resp. to PSMF ¶ 12.)  The parties dispute whether the prices charged to Defendant by its replacement suppliers are higher than the prices charged by Plaintiff for similar parts.  (DSUF ¶ 10; Pl.'s Resp. to DSUF ¶ 10.)  Defendant claims it is entitled to set off amounts owed to Plaintiff on open

invoices with the amounts Defendant incurred as cover damages as a result of Plaintiff's termination of the Agreement.  (DSUF ¶ 11.)

When the relationship with Defendant terminated, Plaintiff returned to Defendant the tooling used to manufacture the parts.  Defendant claims it incurred significant expenses -- approximately $481,000 -- associated with repairs to the tooling as a result of Plaintiff's failure to maintain it properly.  (PSMF ¶ 13; Def.'s Resp. to PSMF ¶ 13.)  Defendant signed releases for two of the tools in question. (Id.)  The tools were delivered to substitute suppliers and were used to make additional parts for Defendant.  (PSMF ¶ 14.)

On February 22, 2005, Plaintiff filed its complaint in this action in the Superior Court of Newton County, Georgia, asserting two claims against Defendant, including (1) a claim on account for unpaid invoices, and (2) a claim for attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11. (Compl., attached as Ex. 1 to Notice of Removal [1].)  Plaintiff claims Defendant failed to pay a total of $701,726.20, exclusive of interest, in outstanding invoices. On March 24, 2005, Defendant removed this case to this Court on the basis of diversity jurisdiction.  (Notice of Removal.)  On March 31, 2005, Defendant answered and asserted its counterclaims.  Defendant claims Plaintiff anticipatorily

repudiated a lifetime agreement to supply parts to Defendant, thereby causing Defendant to incur cover damages, and that Defendant also sustained damages from Plaintiff's failure to maintain the tooling properly.  Defendant's counterclaims include:  (1) breach of the Agreement, (2) breach of the Agreement regarding the tooling equipment, (3) negligence regarding the tooling equipment and (4) expenses of litigation pursuant to O.C.G.A. § 13-6-11.  (Answer & Counterclaim [3].)

Plaintiff moves for partial summary judgment, claiming it is entitled to summary judgment on (i) Plaintiff's claim on account because Defendant admitted acceptance of the goods at issue but did not pay the amount due; (ii) Defendant's first counterclaim on the grounds the Agreement was terminable at will; and (iii) Defendant's counterclaims regarding certain tooling equipment, on the grounds that Defendant released Plaintiff of liability regarding two of the tools at issue.  Defendant moves for summary judgment on all of Plaintiff's claims and on all of Defendant's counterclaims.  Defendant claims Plaintiff breached an enforceable agreement between the parties and that Defendant is entitled to cover damages.

## II.     **DISCUSSION**

-6-

A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  <u>Herzog v. Castle Rock Entm't</u>, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  <u>Graham v. State Farm Mut. Ins. Co.</u>, 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  <u>Id.</u>

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor.  <u>United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.</u>, 894 F.2d 1555, 1558 (11th Cir. 1990).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."

Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

> B.    Defendant's Motion for Partial Summary Judgment

Defendant moves the Court for partial summary judgment on all claims asserted by Plaintiff and on Defendant's counterclaims.  Specifically, Defendant requests the Court to find:  (1) the Agreement between Plaintiff and Defendant was enforceable, (2) Plaintiff's breach of the Agreement was without lawful excuse, and (3) Defendant is entitled to cover damages arising out of Plaintiff's breach and was entitled to deduct its cover damages from amounts due to Plaintiff.

The Court addresses first whether there was an enforceable agreement between the parties.  On December 18, 2001, Plaintiff and Defendant entered the Agreement which provided that Plaintiff would supply Defendant with stamped metal products for three projects.  Defendant claims that "[b]ased on the language of the contract, and the undisputed testimony of the witnesses, the parties signed a

binding contract for the supply of stamped metal parts for the 'lifetime' of the three specific automobile projects defined in the agreement."  (Def.'s Reply in Supp. of Mot. for Partial Summ. J. at 2; Def.'s Mot. for Partial Summ. J. at 18 ("[T]here is no dispute that Clairon and CRH agreed that CRH would purchase all of its requirements for the three seat adjuster programs contained in the December 18, 2001 letter for the life of those programs.").)  Plaintiff claims the Agreement did not bind either party for the life of the programs and that it was terminable at will. (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 3-13.)[4]  Plaintiff argues the Agreement does not specify a duration and that Plaintiff's President, Mr. Link, testified he believed that either party could terminate the relationship at any time. (Link Dep. at 75-76.)[5]

_____

[4] Defendant claims it is within the Court's discretion to disregard Plaintiff's brief in response because Plaintiff's response brief was not served in a timely manner.  (Def.'s Reply in Supp. of Mot. for Partial Summ. J. at n.1.)  The response was timely.  On September 14, 2005, Defendant filed its Motion for Partial Summary Judgment, and on October 7, 2005, Plaintiff filed its brief in response in a timely manner.  See L.R.6.1B, N.D.Ga. ("For time periods greater than eleven (11) days, the three (3) day mail extension of Rule 6(e) is added to the stated response time to create a lengthened time period."); L.R. 7.1B, N.D.Ga. (providing twenty (20) days to serve a response to a motion for summary judgment).

[5] Defendant notes that Mr. Link admitted that Plaintiff wanted to enter an agreement for the life of the three programs.  (Link Dep. at 57.)  This begs the question whether they actually did.

Plaintiff relies on O.C.G.A. § 11-2-309(2) to argue the Agreement is terminable at will.[6]  Section 11-2-309(2) provides:  "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."  Defendant notes this statutory provision applies only to "contracts of indefinite duration," see O.C.G.A. § 11-2-309, comment 7, and the "plain temporal language within the contract . . . [establishes] that the parties' obligations last for the 'life time' of the specified automobile programs underlying the agreement . . . ." (Def.'s Reply in Supp. of Mot. for Partial Summ. J. at 3-4.)  Because substantial legal authority "recognize[s] the valid use of a 'lifetime' to measure a definite time for performance," see, e.g., Mishara Construction Co., Inc. v. Transit-Mixed Concrete Corp., 310 N.E.2d 363 (Mass. 1974), Defendant contends Section 11-2-309(2) does not apply to the Agreement here.

The Court first must determine if the parties contracted for the lifetime of the enumerated projects.  If they did, then the Court must determine if a contract for

_____

[6]  The parties do not dispute that the Agreement was a contract for the sale of goods and that Georgia's enactment of the Uniform Commercial Code applies. (Def.'s Mot. for Partial Summ. J. at 12; Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 5.)

the lifetime of a project is terminable at will or if it is of sufficiently definite

duration to avoid application of Section 11-2-309.

"The construction of a contract is a question of law for the court," O.C.G.A.

§ 13-2-1, "unless the contract contains an ambiguity regarding the parties' intent

that cannot be resolved by applying the rules of construction."  Altama Delta Corp.

v. Howell, 483 S.E.2d 127, 129 (Ga. Ct. App. 1997).  "If the court cannot resolve

an ambiguity in the contract, then the jury must determine its meaning."  Id.

The Court first examines the terms of the Agreement to determine if there

was an agreement as to its duration.  The only reference in the Agreement to its

duration is in paragraph 2.2 of the Agreement.  Paragraph 2.2 states:

> 2.   Prices for mass production products
> . . .
>
> 2.2   Productivity
>
> > The life time agreement (LTA) includes a
> > yearly reduction of 1% for 5 years.  (0%, 1st
> > year/ -1%, 2nd year/ -1%, 3rd/ -1%, 4th
> > year/ -1%, 5th year/ -1%, 6th year)

(Agreement, ¶ 2.2.)

The phrase "life time agreement" is ambiguous.  While it provides for one

percent (1%) reductions for "five years," the parenthetical following it evidences

the last reduction occurs in year six.  The Agreement pertained to three projects but there is no indication whether the projects had the same or different durations, or when any or all of them were expected to be completed.  Defendant urges a clear, unequivocal lifetime duration period based on the phrase "life time agreement" in a productivity provision which is itself unclear and internally  inconsistent.  While paragraph 10 of the Agreement, entitled "Cancellation of the Project," provides for cancellation, it does not assist in determining the duration of any of the projects.  In fact, the section suggests the Agreement has multiple project durations.  Paragraph 10 provides:

> CHR has the right to periodically test the market for competitiveness.  I[n] the event CRH finds CLAIRON . . . to be non-competitive CRH has the right to renegotiate pricing with CLAIRON . . . .  If renegotiation is not successful CRH has the right to cancel all or a portion of the contract with a 6 month written notification.

(Agreement, ¶ 10.)  This right to cancel the Agreement indicates the Agreement is not generally terminable at will by Defendant.[7]  At the same time, the Court notes

---

[7]  While the Agreement imposes on Plaintiff the obligation to provide a full-time program manager, a dedicated quality person and a production planner, arguably while the projects are ongoing, this obligation is not further defined and does not support that the Agreement has a determinable duration.

there is no limitation on Plaintiff's right to cancel the Agreement.  That is, while

paragraph 2.2 references a "life time agreement," it does not itself clearly establish

that the Agreement binds both parties for the lifetime of the projects.[8]  If this

phrase alone was meant to impose an obligation for the lifetime of a project -- that

is, it was intended to impose an unambiguous period for contract duration -- it is

not logical that it was included in the "Prices for mass production products" section

of the Agreement.[9]  An obligation as serious as the one urged by Defendant -- to

bind both parties for the lifetime of the projects -- is difficult to find based on the

provisions and arguments urged by the Defendant.[10]  The duration of the

Agreement simply is not stated clearly.

---

[8]  Nor does the phrase clearly define that "life time agreement" refers to the lifetime of a particular project.

[9]  Plaintiff argues the Agreement was not for the lifetime of the project because both the Agreement and the General Conditions of Purchase contemplate that all transactions would be on an order-by-order basis.  (Pl.'s Mot. for Partial Summ. J. at 2-3, 5-6, 17-18.)  It is not necessarily inconsistent for an agreement for the lifetime of a project to provide that parts be manufactured and delivered as needed by the customer.

[10]  The parties in this relationship appear to be reasonably sophisticated. Commercial agreements of this type at issue here commonly contain clear, unambiguous duration language and termination provisions.  That these were not included in the Agreement likely indicates either the parties wanted duration and termination flexibility or they were more optimistic about the relationship.

Having reviewed the arguments presented by both parties[11], and the Agreement as a whole, the Court finds the Agreement can fairly be understood in more ways than one. Individual provisions of the Agreement are not clear or consistent, and the interrelation of the provisions further makes the Agreement confusing. The Court necessarily concludes the Agreement is ambiguous.[12]

That the parties have differing and varying understandings of the duration of the Agreement underscores that the Agreement is not clear. The deposition testimony of Plaintiff's CEO and President, Mr. Link, and Defendant's Purchasing Manager, Mr. Weier, provide interesting illustrations. Mr. Link testified generally that he hoped the relationship would last for the duration of the projects. (Link Dep. at 57, 74-76.) However, Mr. Link further testified:

> Q    But you know [the Agreement] is for the life of the
>       program, correct?
> A    Well, it could be.
> Q    Whatever it is?

---

[11] The record evidence of negotiations between the parties does not resolve the ambiguity. (See Def.'s Mot. for Partial Summ. J. at 18; Exs. C, D to Def.'s Mot. for Partial Summ. J.; Ex. 6 to Link Dep.)

[12] Understandably, neither party urges the Court to apply the rules of contract construction to resolve the ambiguity. The rules of contract construction do not resolve the ambiguity in the Agreement.

A       It could be.  The customer can decide to move it
        any time.

Q       And you're telling me that if you've agreed to
        produce parts exclusively for this customer for
        however long the program exists, that either one of
        you -- that's your position -- can terminate the
        relationship at any time and walk away?

A       Yes.

(Link Dep. at 75-76.)  In contrast, Mr. Weier testified:  "For me this was, and that's

how CRH sees it, was a lifetime contract."  (Weier Dep. at 146.)[13] [14]

_____

    [13]  Mr. Link also testified:

Q       When you signed this agreement on December
        18th, did you believe that you had a long-term
        relationship with CRH in the works?

A       I believed it was in the works.  I believe that we
        were hopeful that we could negotiate what other
        terms that were referred to in there and come out
        with a long-term agreement.

. . .

Q       . . . Now, what other general conditions of
        purchase or what general conditions of purchase
        did you feel needed to be decided that were left
        open by this document?

. . .

A       Where it says the LTA, I had never heard the term
        up to that point, and I asked Thomas Bleul that  I
        was not comfortable with that sentence, that I
        wasn't very clear on it.

. . .

Q       So what did he tell you?

A       He said it's a standard CRH thing that they put in

Having found the Agreement is ambiguous regarding the duration of the parties' obligations, the issue of the enforceability of the Agreement is inappropriate for summary judgment.[15] [16]  The remaining issues on which Defendant moves for summary judgment -- regarding Plaintiff's alleged breach of

_____

all documents and we would work through it.

(Link Dep. at 45-48.)  This testimony illustrates the genuine dispute of fact regarding the meaning the two parties gave to paragraph 2.2 of the Agreement.

[14]  Defendant submits reasonable legal authority to support its position that an agreement for the lifetime of a project is not indefinite with regards to its duration.  The clarity missing is the definiteness of which project or projects serves to define a "life time" and whether any project lifetime here is certain enough to serve as a durational limitation.  See, e.g., Mishara Constr. Co., Inc. v. Transit-Mixed Concrete Corp., 310 N.E.2d 363, 365 (Mass. 1974).  (See Def.'s Reply Br. in Supp. of Mot. for Partial Summ. J. at 5-9.)

[15]  Plaintiff states "It is undisputed that the phrase 'life time' was used to describe the length of the [automobile] program because it is impossible to know in advance what the duration of the program will actually be."  (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 7.)  On its face, this appears to be an admission that the Agreement was for the lifetime of the specified programs.  However, the Court has considered this statement in the context of Plaintiff's briefs and citations to the depositions of Mr. Weier and Mr. Link.  Upon review of the cited record evidence, it appears Plaintiff simply is arguing the term "lifetime" is indefinite, but is not admitting the Agreement was for the "lifetime" of the projects.  (See Link Dep. at 74-76 (stating his understanding that the Agreement was terminable at will).)

[16]  The Court also has reviewed the General Conditions of Purchase and finds there is no provision describing the duration of the Agreement.  (Ex. 22 to Weir Dep.)

the Agreement, and Defendant's cover damages -- depend on the existence of an

Agreement which is not terminable at will.  Because the Court finds there is a

genuine issue of material fact regarding the parties' intent as to the duration of the

Agreement, and consequently whether it was terminable at will, summary

judgment on these remaining issues also is inappropriate.

      C.    <u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff moves for summary judgment on three issues:  (1) Plaintiff's claim

on account for goods sold to and accepted by Defendant, (2) Defendant's

counterclaim for breach of the Agreement and damages for cover, and (3)

Defendant's counterclaims regarding the tooling equipment.

      1.    *Plaintiff's Claim on Account for Unpaid Invoices*

Plaintiff moves the Court for summary judgment on its claim on account for

unpaid invoices.  Plaintiff claims Defendant accepted the goods, did not reject

them, has not revoked acceptance of them and has failed to pay its invoices.

Plaintiff claims Defendant is liable for the full amount due on the account --

$701,726.20.  Plaintiff argues its claim for the amount due is subject to set off for

damages incurred by Defendant only if Plaintiff breached the Agreement.  Because the Agreement is indefinite and terminable at will, Plaintiff claims there was no breach of the Agreement entitling Defendant to set off its damages.  (Pl.'s Mot. for Partial Summ. J. at 10-11.)

Defendant does not dispute that it has not paid the invoices which are the subject of Plaintiff's claim.  Instead, Defendant claims that Plaintiff's breach of the Agreement forced Defendant to find replacement suppliers and that Defendant is entitled to cover its damages pursuant to O.C.G.A. § 11-2-711.  Because the Court finds there is a genuine issue of material fact regarding the duration of the Agreement and whether it was terminable at will, <u>see</u> *supra*, the issue of Plaintiff's unpaid invoices is a question to be resolved at trial.

2.     *Defendant's Counterclaim for Breach of the Agreement*

Plaintiff moves for summary judgment on Defendant's counterclaim for cover damages for breach of the Agreement on the grounds that the Agreement was indefinite in duration and, therefore, terminable at will subject only to the providing of reasonable notice pursuant O.C.G.A. § 11-2-309.  As discussed *supra*,

-18-

the Court finds there is a genuine issue of material fact regarding the parties' intent

as to the duration of the Agreement.  Accordingly, summary judgment on this issue

is inappropriate

        3.    *Defendant's Counterclaims Regarding the Tooling Equipment*

Defendant asserts counterclaims against Plaintiff for breach of the

Agreement and negligence regarding damage to Defendant's tooling equipment.

Plaintiff moves for partial summary judgment on these counterclaims to the extent

they relate to specific tooling described in a release executed by Defendant,

amounting to $187,600 of the tooling damages counterclaims.[17]  (Pl.'s Mot. for

Partial Summ. J. at 23-24.)  Defendant does not dispute that the release, if

enforceable, covers the two tools described in the release and entitles Plaintiff to

partial summary judgment.  (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 10-

12.)  Instead, Defendant claims it executed the release under duress, and, therefore,

the release is unenforceable as a matter of law.  (Id.)

---

[17]  The release, executed by Defendant on October 26, 2004, states that
Defendant "is to release and hold-harmless Clairon Metals from any responsibility,
warranty or guarantee for any future production of Customer's parts or
maintenance of the Customer's tooling . . . as described below once shipment of
such tooling from Clairon Metals to Customer's designated location has occurred."
(Release Agreement, attached as Ex. 9 to Link Depo.)  The release specifically lists
Part Nos. P011851-01-01 and P011746-01-01.  (Id.)

Defendant claims it was under duress because "in order for [Defendant] to obtain the tooling (which [Defendant] had purchased and owned) from [Plaintiff]'s facilities and transfer the tooling to [Defendant]'s new suppliers, [Defendant] was *required* to sign these release forms."  (Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. at 10.)  Defendant claims if it had not signed the release for the tools it would have "incurred severe financial penalties as a result."  (Id.)

Under Georgia law, "[s]ince the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party."  O.C.G.A. § 13-5-6.  However, "[o]ne may not void a contract on grounds of duress merely because he entered into it with reluctance, the contract is very disadvantageous to him, the bargaining power of the parties was unequal or there was some unfairness in the negotiations preceding the agreement."  Tidwell v. Critz, 282 S.E.2d 104, 108 (Ga. 1981).

In this case, Defendant claims it was under duress because it had no alternatives at the time it executed the release -- if it did not sign the release its replacement suppliers would be unable to manufacture parts.  Defendant's claim of duress fails to invalidate the release it executed as a matter of Georgia law.

-20-

"[E]conomic pressure is insufficient to constitute duress in the legal sense." Ryder Truck Lines, Inc. v. Goren Equip. Co., Inc., 576 F. Supp. 1348, 1355 (N.D. Ga. 1983).  "Defendant could have chosen not to sign the [release] and pursued its legal remedies in tort or for breach of contract.  Instead, [D]efendant, being in a difficult bargaining position, succumbed to economic pressure placed upon it by the [P]laintiff and chose to sign the [release]." Id.[18]  Accordingly, Defendant's claim of duress fails, the release is valid, and Plaintiff is entitled to partial summary judgment on Defendant's counterclaims to the extent they relate to the specific tooling described in the release executed by Defendant.

---

[18]  The Court recognizes that some Georgia courts have noted that "business compulsion" or "economic duress" is a contractual defense under Georgia law. See, e.g., Compris Techs., Inc. v. Techwerks, Inc., 618 S.E.2d 664, 682 (Ga. Ct. App. 2005).  However, these same courts note that "Georgia courts are reluctant to void contracts, and we have found no Georgia decision voiding a contract on the theory of economic duress.  And, in any event, when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." Id.  Here, Defendant fails to establish a contractual defense of "business compulsion" or "economic duress" as a matter of law.  See generally Cooperative Res. Ctr., Inc. v. Southeast Rural Assistance Project, Inc., 569 S.E.2d 545, 547 (Ga. Ct. App. 2002) ("[H]ard bargaining, by itself, cannot support a duress defense.").

D.     <u>Plaintiff's Motion to Amend the Complaint</u>

On October 31, 2005, Plaintiff moved to amend its complaint to add a count alleging fraud.  Plaintiff alleges that in October 2004, when Defendant ordered approximately $700,000 in goods from Plaintiff, it had no intention of paying for them.[19]  Plaintiff claims the evidence supporting its fraud claim was adduced at the end of discovery.  This evidence consists of the August 15, 2005 deposition of Holger Weier, which Plaintiff claims demonstrates Defendant decided in September 2004 it would not pay Plaintiff's invoices but did not inform Plaintiff of this decision until March 2005, after it had induced Plaintiff to manufacture and deliver to Defendant goods in October 2004.  Plaintiff seeks to recover against Defendant for fraud in the amount of its unpaid invoices plus interest, attorneys' fees and expenses of litigation and punitive damages.  (First Am. Compl. ¶ 19.)

Defendant argues Plaintiff's motion to amend should be denied because (i) the deadline for amending pleadings was May 25, 2005, (ii) Plaintiff unduly delayed in seeking to amend its complaint, and (iii) Plaintiff's allegations of fraud do not satisfy Rule 9(b)'s requirement that fraud be pleaded with particularity.  If

---

[19]  The Court notes this $700,000 already is the subject of Plaintiff's claim on account for unpaid invoices.

the Court grants Plaintiff's motion to amend, Defendant requests the Court to

reopen discovery for sixty days to allow Defendant to conduct discovery on

Plaintiff's proposed fraud claim.  (Def.'s Resp. to Pl.'s Mot. to Am. at 16.)

Rule 15 of the Federal Rules of Civil Procedure provides that, once a

responsive pleading has been served, a party may amend its complaint only by

leave of court or by written consent of the adverse party.  Fed. R. Civ. P. 15(a).

Although Rule 15 requires that leave to amend "shall be freely given when justice

so requires," the Eleventh Circuit has instructed that "a motion to amend may be

denied on numerous grounds such as undue delay, undue prejudice to the

defendants, and futility of the amendment."  Maynard v. Bd. of Regents of Div. of

Univs., 342 F.3d 1281, 1287 (11th Cir. 2003) (holding that district court did not

abuse its discretion in denying a motion to amend filed on last day of the discovery

because granting the motion "would have produced more attempts at discovery,

delayed disposition of the case,  . . . likely prejudiced [the adverse party], [and] . . .

there seems to be no good reason why [the movant] could not have made the

motion earlier."); Fed. R. Civ. P. 15(a).

Plaintiff unduly delayed in moving to amend its Complaint.  The Complaint

in this case was filed on February 22, 2005, discovery ended on August 25, 2005,

and the parties filed their respective motions for partial summary judgment on

September 14, 2005.  These motions were fully briefed on October 24, 2005, and

submitted to the Court.  Plaintiff did not file its motion to amend until October 31,

2005, more than two months after the close of discovery, and one month after the

filing of dispositive motions.  In support of its request, Plaintiff relies only on the

fact that Mr. Weier's deposition was not taken until August 15, 2005.  This does

not excuse an untimely filing which would delay a resolution of this action.

The circumstances of each particular case must be considered to determine if

there is undue delay.  Here, Plaintiff knew immediately at the deposition, before

the end of discovery and before dispositive motions were filed, of the alleged

fraud, yet failed to communicate this claim until after all summary judgment

briefing was completed more than two months later.  That Plaintiff was aware of

the grounds for its proposed claim before it filed its motion for partial summary

judgment is clear from its briefs.  (See Pl.'s Mot. for Partial Summ. J. at 8 ("Thus,

in October when CRH asked Clairon to build more than one million parts to create

a parts inventory sufficient to cover the transition period, it had no intention of

paying for them, having decided not to pay in September.") (footnote omitted).)

Plaintiff here has not shown any plausible reason for waiting until well after the

close of discovery and the filing of dispositive motions to request leave to amend.

See, e.g., Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1314-15 (11th

Cir. 2002) (affirming district court's denial of motion to amend filed well after the

deadline for amendments set out in the court's scheduling orders and two months

after the opposing party's motion for summary judgment, holding that "in order to

ensure the orderly administration of justice, [the district court] has the authority

and responsibility to set and enforce reasonable deadlines" and that "[i]t is not an

abuse of discretion for a district court to deny a motion for leave to amend a

complaint when such motion is designed to avoid an impending adverse summary

judgment."); Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1217-18 (11th Cir.

2004) (affirming district court's denial of motion to amend filed six months after

court's deadline for amendments to pleadings and two months after the close of

discovery).

Permitting the amendment also would result in substantial prejudice to

Defendant.  Upon completion of discovery, Defendant decided to move for

summary judgment on all of Plaintiff's claims and on the counterclaims.  In

deciding its litigation strategy, Defendant was entitled to rely on the case as stated

against it at that time.  Plaintiff denied Defendant the opportunity to consider the

case as a whole, and delayed for more than two months before moving to amend its Complaint.

The addition of Plaintiff's proposed fraud claim also would require Defendant, already having filed its motion for partial summary judgment, to engage in additional discovery to determine, at a minimum, (i) whether Plaintiff reasonably relied on any representations by Defendant and (ii) whether Defendant's representative, Mr. Weier, had a duty to disclose when he made his representations.  Requiring Defendant to conduct additional discovery at this stage of the litigation, and then possibly to supplement its dispositive motion briefing, constitutes substantial prejudice and would unduly delay the resolution of this action.

The Court having found that Plaintiff unduly delayed in moving to amend its Complaint and that permitting the amendment would unfairly prejudice Defendant, Plaintiff's proposed amendment will not be allowed.

## III. <u>CONCLUSION</u>

For the reasons stated above,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's motion is **GRANTED** as to Defendant's counterclaims for damage to specific tooling described in the release executed by Defendant.  Plaintiff's motion is **DENIED** as to Plaintiff's claim on account for unpaid invoices and Defendant's counterclaim for breach of the Agreement.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend the Complaint is **DENIED**.

**IT IS FURTHER ORDERED** that the parties submit this action to non-binding mediation on or before August 31, 2006.  The parties may choose who they wish to mediate this matter, in which case the expenses of the mediation are to be paid by the parties.  If the parties prefer the Court to appoint a Magistrate Judge to conduct the mediation and thus avoid the expense of retaining a mediator, the parties should advise the Court on or before August 7, 2006.

The parties shall provide to the mediator within five (5) days after the selection proposed date alternatives to facilitate scheduling the mediation.  The parties are to notify the Court within five (5) days of the mediation whether settlement has been reached.  If there is no settlement, the parties retain the right to

a full trial and shall file their proposed consolidated pretrial order within twenty (20) days of the mediation.  The Court will schedule a pretrial conference immediately thereafter and, in accordance with Local Rule 16.4(A), the case shall be presumed ready for trial on the first calendar after the pretrial order is filed.

**SO ORDERED** this 26th day of July, 2006.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE